**Randall Gene HUGHES, Applicant–Appellant,**

v.

**STATE of Iowa, Respondent–Appellee.**

No. 90–1308.

Court of Appeals of Iowa.

Nov. 26, 1991.

Linda Del Gallo, State Appellate Defender, and Andi S. Lipman, Asst. State Appellate Defender, for applicant-appellant.

Bonnie J. Campbell, Atty. Gen., Julie Ann Halligan, Asst. Atty. Gen., and J. Patrick White, County Atty., for respondent-appellee.

Considered by OXBERGER, C.J., and SCHLEGEL and HABHAB, JJ.

HABHAB, Judge.

In 1986 Randall Hughes was accused of breaking into a motor vehicle and removing certain items. He claimed he was extremely intoxicated on the night in question and had no memory of any such incident. However, the arresting officer testified that Hughes appeared sober at the time of arrest, which occurred shortly after the alleged incident. Hughes also denied committing any burglary and testified that on the night in question there were several other men in the area who met his general physical description (long hair and tattoos).

In 1987 Hughes was convicted, following a jury trial, of burglary in the second degree. His direct appeal of that conviction was later dismissed as frivolous pursuant to Iowa Rule of Appellate Procedure 104.

Hughes later filed the present application for postconviction relief to challenge the burglary conviction. The district court denied postconviction relief, and Hughes has appealed.

Hughes contends his attorney in the 1987 criminal trial rendered ineffective assistance in two respects. He complains the attorney failed to request the submission of lesser-included offenses. He also complains the attorney failed to raise a defense of diminished capacity due to intoxication. He acknowledges that he expressed reservations about such a defense, but argues the attorney should have explained the defense more thoroughly and should have demonstrated its value to him.

Appellant also claims he was denied effective representation of counsel. Established principles govern our review of appellant's sixth amendment claim his counsel was ineffective. When considering this claim, our ultimate concern is with "the fundamental fairness of the proceeding whose result is being challenged." *Strickland v. Washington*, 466 U.S. 668, 696, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699 (1984). In deciding this we must consider whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. "In examining counsel's conduct we review de novo the totality of relevant circumstances." *State v. Risdal*, 404 N.W.2d 130, 131 (Iowa 1987) (citations omitted). "Defendant bears the burden of proving by a preponderance of the evidence that (1) counsel failed to perform an essential duty and (2) prejudice resulted." *Id.* at 131–32.

■ In proving the first prong of this test, appellant must overcome the strong presumption counsel's actions were reasonable under the circumstances and fell within the normal range of professional competency. *State v. Hildebrant*, 405 N.W.2d 839, 841 (Iowa 1987). To prove the second prong of this test, appellant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 (1984). With these principles in mind we now turn to appellant's specific claims.

### I. *Lesser–Included Instructions*

■ Hughes first contends his trial counsel rendered ineffective assistance by not requesting lesser-included offense instructions or objecting to the trial court's failure to give such instructions. *See State v. Jeffries*, 430 N.W.2d 728, 737 (Iowa 1988). However, before deciding the issue, we look to see if Hughes' trial counsel had any tactical or other reasons for not requesting the instruction. *See id.; Fryer v. State*, 325 N.W.2d 400, (Iowa 1982).

At the postconviction hearing Hughes' trial counsel testified Hughes was relying on a mistaken identification defense. We set out the relevant portion of the trial attorney's testimony:

Q. I see. What was your trial strategy in the defense of Mr. Hughes, just in general? A. The basic strategy was that Mr. Hughes denied committing the crime. He denied breaking into the truck, and he denied being in the same position that some of the witnesses had put him in in the evening.

Q. How would requesting for a jury instruction of lesser included offense fit into that overall trial strategy? A. Lesser included offenses are very tricky because sometimes the jury views them in—in ways that can harm the defense's case. In this particular case, where there was a complete denial of—of the charged offense, most of the time you wouldn't—you wouldn't ask for lesser included offenses. There might be occasions, depending upon the specific facts, that you would, but if the defendant is—is denying any participation in the acts which—which led to the charge, in—in a

total denial situation, I don't think that—and especially in a burglary case, that there would be any lesser included. Also, this is a vehicle burglary, so—so the lesser included would, by that fact, be excluded, such as criminal trespass and things like that.

We conclude the trial attorney had a reasonable tactical premise for not insisting on a lesser-included offense instruction. He was attempting to present a consistent defense to the jury. His client was claiming complete innocence. The trial attorney elected to put the issue before the jury as an all-or-nothing defense, essentially making the jury decide guilt or innocence on the main charge only. The reasoning behind this appears to be that if lesser-included offense instructions were also given, the jury could compromise its verdict without really having to decide if they believed Hughes to be innocent.

We determine Hughes' trial counsel made a reasonable tactical decision under the circumstances. Simply because Hughes lost the gamble does not render his counsel ineffective. We determine Hughes has failed to prove the first prong of the test that his counsel breached an essential duty. We affirm on this issue.

## II. *Intoxication Defense*

Hughes next argues his counsel was ineffective in failing to present an intoxication defense. Burglary is a specific intent crime, so intoxication could establish diminished responsibility. The specific intent element would be thereby negated.

Our review of the record reveals it was Hughes who insisted on not presenting the intoxication defense. He desired to proceed on the grounds he was totally innocent. He did not want to prejudice his case by what he perceived to be an inconsistent defense. We set out the pertinent testimony of his trial counsel at the postconviction hearing:

Q. Uh-huh. A. And that—that I discussed that with Mr. Hughes.

Q. What do you recall of your discussion with Mr. Hughes of the diminished capacity defense? A. I just recall that—that I ran into the same problems

that Ms. Mellon did—to proceed. That's not the way he wanted to deny the commission of the act.

\* \* \* \* \* \*

A. Well, first of all, diminished capacity/intoxication is well known in the defense bar as being a last chance defense. Criminal lawyers do not have, generally have much success with it. It's not a defense that I've had much success with in front of juries, and especially in crimes which do not involve sophisticated intent. That is, a crime like Burglary, where the capacity must be diminished to such an extent that one cannot intend to commit a theft.

\* \* \* \* \* \*

Q. It's not the greatest defense? A. Right. That it's a real last chance defense, and if you have any other defense, it may be better to raise that.

Q. Is it possible that you advised Mr. Hughes that it would be better to raise the defense that he didn't do it and not raise the defense of diminished capacity? A. My recollection is that, like Sharon [Mellon, Hughes's first attorney], I felt that diminished capacity, in this case, was probably the best defense. Whether I told him that he couldn't raise the factual defense or whether I told him that it would be difficult to do both defenses, I don't recall. I may have.

\* \* \* \* \* \*

Q. Could you elaborate on the theory regarding total—or that he didn't do it defense versus the intox—the intoxication defense and—well, could you just—what—what was your advice to Mr. Hughes in your trial strategy in that regard? A. Well, from reading the parts of the transcript that I have seen and looking at the file, it appeared that Mr. Hughes was denying basically having broken into the vehicle and stolen anything. And from his testimony or the parts that I have read, he testified that he didn't do it and that he specifically recalled not doing it. It would be very difficult to raise an intoxication defense in—in that—with that state of facts

where the defendant is saying, "I know what I did and I know what I didn't do. I didn't—I didn't commit the crime, and I remember not committing the crime." That makes it very difficult to raise an intoxication defense in this type of property crime.

Q. A—do you, reflecting now—did you, reflecting now, fail to perform any duty as a defense counsel to Mr. Hughes? A. Well, other than the—the one question that—that Ms. Hoefer asked me about finding one question there may be objectional there, today, no. I think every defense attorney, when they think back on a trial, there are probably things that—that you might have done with hindsight, but in general, this case was—was tried, given the facts, I think, as best as it could be tried.

Q. Was Mr. Hughes prejudiced by any aspect of your representation? A. No.

BY MR. TUNGESVIK: That's all, your Honor.

THE COURT: Anything else?

BY MS. HOEFER: I just have one question.

BY MS. HOEFER:

Q. You were asked about discussions you had with Mr. Hughes about raising the incapacity/intoxication defense. And my understanding of your answer was that you said what he told Sharon about raising that defense. What did he tell you about raising that defense? A. My only recollection, and it's not detailed, is that I received the same response from him that Sharon did, and the reason—and that that was not the way he wanted to try the case, and that—that part I remember very specifically because of my discussions with—with Sharon about her experiences in—in preparing this case for trial, because I thought it odd that Dr. Marchman had been commissioned to do the work, which was groundwork for raising, or for the possibility of raising, an intoxication defense. I questioned her and I recall having a discussion with her about why it wasn't being raised.

Q. It seemed like you recall a specific discussion with Sharon about him not wanting to raise that defense. Your recollection seems a little shady on discussion with Mr. Hughes about raising that defense? A. I don't really remember the specifics, but I remember that he continued to be adamant about not using an intox defense.

Q. Do you specifically recall that he didn't want to use an intoxication defense, or he wanted to say that he didn't do it? Do you understand the— A. No, I understand the difference, and I recall that he said that he did not want to use an intoxication defense, and this is specifically—this is specifically the same thing that he said to Ms. Mellon.

The trial attorney's testimony regarding presenting the intoxication defense is consistent with his reasoning for not requesting the lesser-included instructions. Hughes himself did not desire the intoxication defense. He wanted to proceed on an all-or-nothing defense. His basic defense theory was total innocence. Apparently Hughes dismissed his first attorney, Sharon Mellon, at least partly because she wanted to present the intoxication defense.

Hughes clearly waived the intoxication defense, as he was free to do. He insisted on an all-or-nothing defense strategy. He may not now claim his trial counsel erred by not presenting a defense he himself objected to.

We determine Hughes has failed to show either a breach of a duty or prejudice on this issue. We affirm the trial court in full.

AFFIRMED.