**IN THE COURT OF APPEALS OF IOWA**

No. 17-1903
Filed October 10, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**TRAE D. JACKSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge (sentencing), and Christine Dalton Ploof, District Associate Judge (trial).

Trae Jackson appeals following his convictions for operating while under the influence, third offense; driving while barred; and unlawful possession of a prescription drug. **REVERSED IN PART, SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**

Zeke R. McCartney of Reynolds & Kenline, LLP, Dubuque, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

Trae Jackson appeals following his convictions for operating while under the influence, third offense; driving while barred; and unlawful possession of a prescription drug. He challenges the sufficiency and weight of the evidence that he was operating a vehicle. We reverse and remand the convictions of operating while under the influence and driving while barred because there is not substantial evidence Jackson was "operating" the vehicle. We vacate the sentences imposed, and remand for dismissal of those charges and for resentencing.[1]

**I. Background Facts and Proceedings.**

At about 9:30 p.m. on May 12, 2017, Joseph Mahieu heard a loud crash outside his Davenport home and looked out a window to see a car—later identified as a Camry—had crashed into the back of a pickup truck parked along the curb, pushing the pickup up onto the curb. The front end of the Camry had extensive damage and was resting against the back of the pickup, and its bumper was lying in the street. Mahieu "figured somebody is hurt really bad here, so I had the wife call the ambulance." He then unlocked his door and looked out. Mahieu stated he went outside and observed one person wearing a "light-colored shirt" standing near the front bumper on the driver's side of the Camry and back bumper of the pickup, "because they were one." Mahiew observed another "skinnier" and taller person about fifteen feet away from the car on the passenger side. Mahieu stated, "[T]hey were in the midst of leaving at the time as I was coming outside." Mahieu ran "halfway cross the street" and called to one of the men that he had "called the

---

[1] Jackson does not challenge his conviction for unlawful possession of a prescription drug and that conviction is thus affirmed.

ambulance for you guys." The two people who had been near the car left the area in different directions.

Mahieu then ran back to his house, asked his wife to call police, and then went back outside and joined two neighbors. After looking at the crashed car, the neighbors walked down a nearby dark alley. Mahieu stated:

> We heard somebody in the backyard of one of the fences, and we kind of just hung out there for a second. And we walked down as we heard the noise, and all of the sudden this guy comes up over the top of a six foot fence, lands smack dab on his back right in front of us. It kind of scared the tar out of us.

That man was wearing a light-colored shirt but Mahieu could not say it was the same person he had seen standing on the driver's side of the crashed car. Mahieu, the other neighbors, and the person who came over the fence walked back to the car scene.

A short time later, Mahieu spoke to a police officer but was unable to identify either of the people he had seen near the car. At trial, Mahieu could not say that the person who came over the fence was one of the two people he had seen near the crashed car.

Davenport Officer Joel Griffin arrived at the crash scene at 9:36 p.m. and observed a silver Toyota Camry that had rear-ended a parked, green Ford F-150 pickup, pushing it up onto the curb. The scene was captured by the video recording from his police car:



Officer Griffin turned on his audio recording equipment at 9:37 p.m. as he approached "a man standing on the sidewalk" on the passenger side of the vehicle who appeared to have been in an accident as he was bleeding from an injury on his right wrist. Officer Griffin asked if the person wanted an ambulance. He declined. The officer then asked the person if the car was his. The person said no. When asked if he was driving the vehicle, the person again said no.[2] Officer Griffin then learned the person, who was wearing a light-colored shirt and jeans, was Jackson. The officer "assumed he was extremely intoxicated by the way he looked and the way he was acting." According to the officer, Jackson was reaching in his pockets "a lot."

Officer Griffin conducted a pat-down search. Jackson told the officer he might have a knife in his pocket, but Officer Griffin found no knife. However, Officer

---

[2] In his trial testimony, Officer Griffin stated it took Jackson "several seconds" to respond to his question of whether he was driving. While the audio recording from Officer Griffin's microphone picks up the officer's voice well, Jackson's voice is barely audible. However, we are able to hear that when asked "were you driving?" Jackson quickly said "no." It was when Officer Griffin asked if the "other guy" was driving, Jackson took several seconds to make a response. We are not able to clearly hear his response.

Griffin found a bottle of pills, later determined to be Alprazolam (commonly known as Xanax), in Jackson's pocket with the label partially torn off. There was also a key in Jackson's pocket, but the key was not for the Camry. No key for the Camry was found. Officer Griffin read Jackson his rights. Jackson continued to speak with him, told him the car was his mother's, and said he had been in the car in the front-passenger seat. He denied he had been driving. Jackson stated he had different drivers. The officer asked, "Who was driving when it crashed?" Jackson said, "Crashed into what?" He did not seem to know the car he was sitting next to had been involved in a crash. Officer Griffin believed Jackson was intoxicated and uncooperative and/or "very, very confused." Jackson told Officer Griffin there had been four or five people in the car but he would not or could not tell him who had been driving.[3] Jackson repeatedly denied driving the car.

Jackson consented to field sobriety testing, which began at 10:04 p.m. Jackson failed the horizontal gaze nystagmus test. At 10:08 p.m., Jackson asked, "What is this?" The officer talked about "this accident," and Jackson expressed confusion, stating he thought the officer's car was his. Upon turning to see the damaged Camry, Jackson appeared distressed. Jackson was not able to complete other tests. At 10:16 p.m., Jackson asked where he was and expressed surprise to learn he was in Davenport, believing he was in Eldridge. Jackson was arrested on suspicion of operating while intoxicated (OWI) and driving while barred (DWB). He was transported to the jail, dozing off en route. At the jail, Jackson

---

[3] At about 9:50 p.m., Officer Griffin can be heard discussing with another officer whether there was probable cause to believe Jackson was driving based on Jackson saying it was his mother's car and Jackson stating there were four or five people in the car but refusing to tell the officer who was driving.

answered some questions, repeatedly denied he had been driving, and ultimately refused to provide a breath sample for chemical testing.

On cross-examination at trial, Officer Griffin acknowledged the horizontal gaze nystagmus test could indicate a concussion as well as intoxication. Despite having a bleeding wrist, Jackson was not seen by medical personnel. Officer Griffin acknowledged the Camry had sustained severe damage but could not recall if the air bags had deployed.

At the close of the State's evidence, Jackson moved for a judgment of acquittal, asserting there was no evidence he had been the driver of the vehicle. The court denied the motion, observing that while it was a "very circumstantial case," "it's enough to have the jury make the decision based on the facts they believe or find to be true in this case."

Jackson stipulated he was barred from driving and the jury was instructed Jackson "has admitted that his privilege/license to drive was barred."

The jury found Jackson guilty of OWI and DWB. He now appeals.

**II. Scope and Standard of Review.**

Our review of the sufficiency of the evidence is for corrections of errors at law. *See State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). We consider the record evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We will uphold the jury's verdicts if they are supported by substantial evidence. *Id.* Evidence is substantial when a reasonable jury could rely on it to find the defendant guilty beyond a reasonable doubt. *Id.* Evidence is not substantial if it raises only suspicion, speculation, or conjecture.

*Id.* If the evidence is not substantial, we must reverse and remand for dismissal.

*Id.*

## III. Discussion.

> The crime of operating while intoxicated has two elements. The state must first prove the defendant operated a motor vehicle. Iowa Code § 321J.2 [(2017)]. Second, the state must prove the defendant was, at the time, "under the influence of an alcoholic beverage or other drug," or some combination, or had an excessive blood alcohol level. *Id.*

*State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004). The state also has to prove a defendant operated a vehicle while his license is barred to convict of DWB. Iowa Code § 321.561 ("It shall be unlawful for any person found to be a habitual offender to operate any motor vehicle in this state during the period of time specified in section 321.560 except for a habitual offender who has been granted a temporary restricted license . . . .").

As this court recently explained,

> The term "operate" has been defined as "the immediate, actual physical control over a motor vehicle that is in motion and/or has its engine running." *State v. Hopkins*, 576 N.W.2d 374, 377 (Iowa 1998) (quoting *State v. Boleyn*, 547 N.W.2d 202, 205 (Iowa 1996)). Even if the evidence fails to prove that an intoxicated defendant "was in the process of operating a motor vehicle when the authorities found" the defendant, "circumstantial evidence may establish that the defendant *had* operated while intoxicated when driving to the location." *Id.*

*State v. Ascencio*, No. 16-0992, 2017 WL 2684343, at *1 (Iowa Ct. App. June 21, 2017). Circumstantial evidence,

> is the proof "of one fact, or a set of facts, from which the existence of the fact to be determined may reasonably be inferred." Circumstantial evidence involves two things: (1) "the assertion of witnesses as to what they have observed," and (2) "a process of reasoning, or inference, by which a conclusion is drawn." Circumstantial evidence "must be based upon the evidence given,

together with a sufficient background of human experience to justify the conclusion."

*Hopkins*, 576 N.W.2d at 378 (citation omitted).

The only question presented to us is whether the State proved beyond a reasonable doubt that Jackson had operated the vehicle while intoxicated. If the evidence is not sufficient to find Jackson operated the motor vehicle, both the OWI and DWB convictions lack substantial evidence.

There is no evidence placing Jackson in control of the Camry. *Compare id.* ("The firefighters found Hopkins unconscious in the driver's seat, with all of the controls within her reach. The key was in the ignition. Some thirty to forty minutes before she was found, Niemeier saw Hopkins' car traveling very slowly, come to a stop, and park along the road. Her car was pointed south, in the direction of her home, which was about a quarter of a mile away."), *with Ascensio*, 2017 WL 2684343, at *3 ("The district court as fact finder reasonably found from the convenience stores employees' unequivocal testimony that Ascencio drove the red SUV from the store. Although the police officer later saw a woman at the wheel, it was within the district court's purview to credit the testimony of the store employees, given a window of approximately five to ten minutes in which Ascencio could have picked up a passenger and switched to the passenger seat."); *State v. Kohlmeyer*, No. 16-0267, 2017 WL 1400811, at *3 (Iowa Ct. App. Apr. 19, 2017) ("[B]ased upon direct testimony from witness Jackson, the jury could find that Kohlmeyer exhibited a physical sign of being intoxicated at the collision scene, when she exited the vehicle and was unsteady on her feet.").

Here, the State's evidence consisted of Mahieu's testimony he saw an individual in a "light-colored shirt" standing near the driver's side of the crashed Camry and a taller, thinner man about fifteen feet away from the passenger side. Mahieu could not identify the individual in the light-colored shirt, could not determine whether there was one or multiple individuals in a light-colored shirt, and did not recognize Jackson. While the evidence establishes Jackson was wearing a light-colored shirt and admitted the vehicle was his mother's, it is mere speculation he operated the Camry. No witness places Jackson behind the wheel. Jackson did state he was in the passenger seat but repeatedly denied having been the driver. One would assume that the force of the collision would have deployed the airbags, but Officer Griffin did not recall whether the airbags had deployed. No photos of the interior of the vehicle were provided. And Jackson bore no indication of having been in an encounter with an airbag. No key to the vehicle was found on Jackson or elsewhere. It is a leap from the facts proved—that Jackson was impaired and admitted he was in his mother's car—to a finding that he was the driver of the vehicle.

There is no doubt Jackson's functioning was impaired. But, the facts presented do not prove beyond a reasonable doubt that he was operating the vehicle. "[M]ere presence at the scene of a crime is not enough to prove defendant committed the offense." *State v. DeRaad*, 164 N.W.2d 108, 109 (Iowa 1969). The ownership of the vehicle does not prove Jackson was "operating" the vehicle. Even if Jackson was one of the two individuals observed by Mahieu when he first observed the scene, both individuals Mahieu observed left the scene—so the evidence of flight failed to assist in the identification of the driver. We also find little

solace in the State's claim Jackson had a motive to lie that he was not driving because of his past driving offenses. We find this argument speculative. Due to Jackson's state of intoxication, he did not even know the city he was located in; he may not have known who was the driver. Nor do we know if he had the wherewithall to lie because of his past driving record. He may have also not wanted to rat out a friend. We could also speculate the driver had the keys to the vehicle. The reality is—we cannot speculate. The circumstantial evidence does not establish proof beyond a reasonable doubt.

Because there was insufficient evidence in the record to support the jury's verdicts of OWI and DWB, we reverse those convictions, vacate the sentences imposed, and remand the case for dismissal of those charges and resentencing on his conviction for unlawful possession of a prescription drug.

**REVERSED IN PART, SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**